**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. Action No. 21-0084 PLF |
| CODY PAGE CARTER CONNELL, and DANIEL PAGE ADAMS, | |
| Defendants. | |

## DEFENDANT CODY CONNELL'S RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM

The government seeks an extraordinarily harsh sentence for Mr. Connell, a single father who was inside the Capitol for all of three minutes, in reliance upon an offense level calculation that is incorrect. And because the government's charging decisions and plea offers in Capitol cases have been inconsistent, the government recommends a sentence that is far more severe than that imposed upon January 6 defendants who engaged in similar or even more serious conduct. The government seeks a sentence here along the lines of those imposed upon members of extremist groups, defendants who repeatedly harassed and violently assaulted officers, who spent extended periods inside the Capitol, and who caused damage or stole items from the Capitol. Although the government justifies its draconian recommendation by pointing to Mr. Connell's presence near the front of the group on the Northwest stairs and at the Senate Wing doors, the defense will provide herein several examples of defendants who were in those same places (and then spent far more time inside the

Capitol) who received sentences of less than one year in prison. This Court should reject the government's unreasonable sentencing recommendation.

## I.      Government charging and plea decisions result in disparate sentences in January 6 cases

Section 3553(a)(6) of Title 18 directs a sentencing court to seek to avoid unwarranted sentence disparities among defendants who engaged in similar conduct. In its sentencing memorandum, the government suggests that so long as this Court correctly calculates the guidelines range, it can cast aside any concerns it may have about potential disparities with sentences imposed in other January 6 cases.  This the Court should not do. Indeed, the comparison cases provided by the government in its sentencing memorandum prove the point made by Mr. Connell in his opening sentencing memorandum: charges filed, pleas offered, and sentences sought by the government in January 6 cases do not correlate directly with a defendant's level of culpability. The government's charging and plea decisions single-handedly dictate the guideline range faced by a defendant at sentencing.  Defendants who engaged in the same or worse conduct than others on January 6 might face significantly lower guideline ranges solely because the government chose not to charge particular offenses, or to offer a plea to a lesser charge.

To make matters worse, the government has exercised it charging and plea discretion in a manner that is untethered to a defensible metric. This is most clear in cases involving defendants who made any contact, however minor and brief, with members of law enforcement and entered the Capitol. Those individuals could be charged with the full gamut of offenses this Court has seen: Obstruction, Assault,

Civil Disorder, and misdemeanor offenses including Entering and Remaining in a Restricted Area. Taken a step further, plea offers in these cases could involve the dismissal of any of the above charges. Those entirely discretionary government charging and plea decisions determine whether the guideline range at sentencing calls for a sentence of less than a year or instead several years in prison. The end result is what we see here: the government seeks a harsh sentence, ostensibly justified by its guideline calculations, that stems from a decision to seek convictions for crimes that it did not charge against people who engaged in the same or more serious conduct.

The government essentially concedes this point by acknowledging, in a *footnote* at page 35 of its memorandum, two instructive prior sentences. These two cases involve individuals who engaged in similar or worse conduct than Mr. Connell, but the government used its discretion to charge them solely with Civil Disorder under 18 U.S.C. § 231(a)(3), resulting in a guideline range significantly lower than the government advocates for in this case.  A summary of the facts of each case follows:

### *United States v. Nolan Cooke, No. 22-CR-52 (RCL)*

Mr. Cooke approached the Capitol from the opposite side of the building as Mr. Connell and Mr. Adams. There, on the East side of the Capitol, Mr. Cooke led the crowd of rioters who broke through lines of Capitol Police. Reflecting the words of the government in its sentencing memorandum in Mr. Connell's case, Mr. Cooke was "effectively, the tip of the mob's spear in that area of the Capitol." U.S. Sent. Memo, p. 5.

Mr. Cooke repeatedly taunted officers, raising his middle finger at officers and screaming at them, yelling "This is our fucking land," "here, piggy, piggy, piggy," and "we're taking this motherfucker," among other things. ECF No. 52.  He also assaulted police officers, pushing bike racks at them and pushing an officer's riot shield.  He

 

Cooke pushing bike rack into officers, then pushing past officers

encouraged other rioters by yelling "Go," "Get these motherfuckers!" and "Now, now, now!"  After Cooke succeeded in forcing officers to retreat from their first line of defense on the East plaza to form a new line on the stairs of the Capitol, Cooke charged after them, yelling "Nothing's holding us fucking back," and "We're taking this motherfucker."  Cooke then again led the crowd up the stairs as officers retreated to the Capitol building.  At the Columbus Doors to the Capitol, Mr. Cooke continued to push against officers and at one point grabbed the edge of the doors in an effort to open them before being pushed back by officers. As the police desperately tried to keep rioters at bay, Mr. Cooke yelled to the crowd: "Push, push," "Smash the windows. I'll crawl through it [sic]", and "Bust the windows…. Break the glass," "and "We're going in," "Let's go!"  Cooke then pushed through the crowd and struck a window on the door three times with his flagpole in an effort to break it.  Cooke got within feet

of the door as rioters were able to get in, but he retreated after he was overcome by the effect of tear gas.  Cooke then boasted to other rioters that he was "one of the first ones to run through, man.  It was fun."

Despite being the leader of the crowd on the East front of the Capitol and despite repeatedly assaulting officers, Mr. Cooke was charged with, and pled guilty to, Civil Disorder. For that reason alone, the guideline range was 8-14 months. The government sought a sentence of 11 months and Judge Lamberth sentenced Mr. Cooke to one year and one day. If anything, Mr. Cooke's conduct was significantly more serious than Mr. Connell's.  Mr. Connell did not taunt police. He did not seek to smash any windows. And although he did briefly push past officers on the stairway, he did not engage in extended and repeated pushing matches with police officers like Mr. Cooke did. Mr. Connell did go inside the Capitol building, albeit for only three minutes, but this does not make him more culpable than Mr. Cooke in any meaningful way: the only reason Mr. Cooke did not enter the building is because he had been hit by tear gas and was forced to retreat.

### *United States v. Moises Romero, 21-CR-677 (TSC)*

The second case acknowledged by the government in footnote 6 at page 35 of its memorandum is that of Moises Romero. Mr. Romero traveled to the Capitol ready for battle wearing a dual-cartridge respirator and safety glasses. After taking videos of rioters attacking police and throwing projectiles, Mr. Romero walked up the Northwest steps under the scaffolding. He pushed against a line of police and was able to get past them to the lower West Terrace.  By the time Mr. Romero arrived at

the Senate Wing door, Capitol Police Officers had managed to temporarily stop rioters from entering. Mr. Romero joined rioters who pushed a barrier out of the way and into the officers, then tried to push past officers who were trying to keep rioters from passing through the door. After an extended pushing match with lines of officers, Mr.



**Mr. Romero pushes into police guarding Senate Wing door**

Romero and the other rioters managed to break through and crowds of rioters poured into the building. Mr. Romero

proceeded to walk throughout the building, including to Senators' offices and the Crypt. Mr. Romero left the building after 15 minutes. In the days that followed, Mr. Romero posted celebratory messages on social media.

Like Mr. Cooke, Mr. Romero was charged with Civil Disorder and other lesser charges and was offered a plea to one count of Civil Disorder. The government sought a sentence of 11 months and Judge Chutkan sentenced Mr. Romero to one year and one day. Again here, Mr. Romero's conduct was at least as serious as that of Mr. Connell. Mr. Connell did not show up at the Capitol in tactical gear. He did not engage in multiple lengthy pushing matches with police officers. And he did not spend 15

6

minutes inside the building. Yet simply because the government chose to charge Mr. Connell with Obstruction, Assault and other offenses, the guideline range sought by the government is far higher here. Mr. Connell should not receive a harsher sentence than either Mr. Cooke or Mr. Romero.

## II.   The government's comparison cases do not support its sentencing recommendation

The government suggests that the cases of Greg Rubenacker and Scott Fairlamb are fair comparators here. A close review of the conduct of these two men demonstrates that they are not. The only relevant similarity between Mr. Connell and these two defendants is that the government chose to seek convictions for the same charges, resulting in similar guidelines calculations.

### United States v. Greg Rubenacker, No. 21-CR-193 (BAH)

While it is true that Mr. Rubenacker entered the Capitol through the same door as Mr. Connell at approximately the same time, the similarities between the two men end there. After entering the Capitol, Mr. Connell turned around and left of his own free will after three minutes. Mr. Rubenacker did the opposite, staying in the building and engaging in notoriously reprehensible conduct while inside, including repeatedly assaulting multiple police officers.  Specifically, Mr. Rubenacker was one of the main rioters who chased United States Capitol Police Officer Eugene Goodman through the Capitol, ignoring Officer Goodman's repeated pleas that Mr. Rubenacker



**Rubenacker (circled) chases Officer Goodman up stairs**



**Rubenacker at front of crowd yelling at officers to "go arrest the Vice President"**

"back up."[1]  Then Rubenacker breached the Capitol a *second time* at a different location.   ECF No. 56.   He entered through the East Rotunda doors that had just been breached by a violent mob which had assaulted law enforcement officers, fired pepper spray at them, beaten officers with shields and flagpoles, and fired projectiles at the officers and doors.  Mr. Rubenacker then walked into the Rotunda, where he joined another group pushing forward against a separate line of officers trying to repel rioters.  Deterred by pepper spray, Rubenacker retreated into the Rotunda and smoked a joint, yelling "Smoke out the Capitol, baby!"  When officers tried to clear him and others out of the Rotunda, Rubenacker berated them, yelling "Who are you serving? We are the people! Why are

---

[1] Exhibit 8 to the government's sentencing memorandum in Mr. Connell's case is video taken by a *different* person and depicts that person, after entering the Capitol, chasing Officer Eugene Goodman up the stairs to the second floor.  To be clear, neither Mr. Connell nor Mr. Adams followed Officer Goodman.

you not protecting us?"  As rioters again attacked officers, Rubenacker refused an officer's request that he "go out the door," instead yelling at the officer: "You're a communist!" and again pushing with other rioters against a line of officers.

Mr. Rubenacker then engaged in two more assaults on law enforcement officers. First, he hit an officer in the head with a bottle. He then threw liquid from his bottle at the officers. Mr. Rubenacker finally left the Capitol after being sprayed in the face with chemical spray.  He had been in the Capitol for a total of 42 minutes. After January 6, Rubenacker celebrated his involvement online, including claiming that he was "let into the capital [sic] by police."

Judge Howell sentenced Mr. Rubenacker to 41 months imprisonment.  Given that his conduct was exponentially more serious than that of Mr. Connell, the government's reliance upon his case in suggesting an even longer sentence for Mr. Connell strains credulity.  In fact, Mr. Connell should receive a sentence *far less harsh* than that imposed on Mr. Rubenacker.

### United States v. Scott Fairlamb, 21-CR-120 (RCL)

Scott Fairlamb climbed the scaffolding on the west side of the Capitol and, like Mr. Connell, pushed past police attempting to hold the line at the Northwest stairway.  However, Mr. Fairlamb then armed himself with a police baton and filmed a video in which he yelled: "What Patriots do? We fuckin' disarm them and then we storm the fuckin' Capitol!"  ECF No. 50.  Fairlamb entered through the Senate Wing Door while brandishing the police baton soon after Mr. Connell did.

9

Once he left the building, though, Mr. Fairlamb was not done.  He followed and harassed a line of MPD officers, yelling: "Are you an American? Act like a fucking one!"  He then shoved an officer so hard that he fell into a line of watching rioters.

 

**Fairlamb berating, then punching MPD Officer**

Fairlamb then put his finger in the officer's face and when the officer pushed Fairlamb's hand aside, he punched the officer in the head. Then in the days after January 6 Mr. Fairlamb continued to use incendiary rhetoric online, including "They pulled the pin on the grenade, and the blackout is coming. What a time to be a patriot" and "it's go time."  He also messaged other Instagram users saying "I'd go again." Further searches of his social media revealed that he made violent threats directed at congresswoman Cori Bush.

Mr. Fairlamb was offered a plea to Assault and Obstruction. The government sought a sentence of 44 months and Judge Lamberth sentenced him to 41 months imprisonment.  Again, Mr. Connell's conduct was far less serious.  Mr. Connell did not possess any weapons.  He did not harass police officers.  He did not punch a police

officer in the head. He did not threaten individual members of Congress. His sentence should not in any way approximate that imposed on Mr. Fairlamb.

### III. Sentences imposed upon defendants who were at the front on the Northwest Stairs and at the Senate Wing Doors

The government places great emphasis on Mr. Connell's presence on the Northwest stairs and the fact that he was among the first people to enter the Capitol through the Senate Wing Doors. Many defendants who fit this description have already been sentenced to terms far less harsh than the government seeks here. To the extent the Court seeks examples of other defendants who were within the crowd that pushed up the Northwest stairs with Mr. Connell and were among the first to enter through the Senate Wing doors, the defense has identified a handful.

*United States v. Matthew Mark Wood, 21-CR-223 (APM)*

Like Mr. Connell, Mr. Wood went inside the scaffolding to get to the stairway up to the Northwest Plaza. Like Mr. Connell, Mr. Wood was among the individuals



**Mr. Wood at the front of the crowd on the NW Staircase**

close to the officers trying to deter rioters from climbing those stairs, and he was in the crowd that moved past those officers. Mr. Wood then went to the front of the crowd in the Northwest Plaza and was

11

the tenth rioter to enter the Capitol through a broken window at the Senate Wing Door. But Mr. Wood's actions on January 6 went far beyond that of Mr. Connell:

- Even before climbing the Northwest Stairs, Mr. Wood climbed a media tower, then stood at a hole in the scaffolding yelling to rioters to move forward.



**Mr. Wood inside scaffolding on NW Stairs calling rioters forward**

- Once inside the Capitol, Mr. Wood spent well over an hour inside, making his way into many more locations within the Capitol than most other rioters.

- He joined rioters confronting USCP officers and pursuing them through the Brumidi corridors and up to the second floor.

- He joined rioters refusing to leave the building, and instead threatening, rushing, and pushing back USCP officers.

- Wood then announced that "we are going to bust into the house chambers," and joined rioters who had breached a police line and traveled into the House Speaker's office suite. There, he entered the Speaker's conference room yelling, "Madam Speaker, we want to have a word with you!" and "Here's Johnny!."

- When he found the entrance to the House chamber, Mr. Wood called other rioters to help, only to be deterred by chemical irritant and officers with guns.

- Wood then remained in the Rotunda for an extended period, resisting police efforts to push him and others out of the building. He yelled at officers, pushed against them, and pushed against other rioters who were resisting the police.

- After he finally left the Capitol, Wood celebrated his actions on social media, bragging that "we sent those politicians running," and that "7

agencies couldn't stop us, the FBI, Homeland Security, Metro Police, DC Police, Capitol Police, Secret Service, and National Guard."

- He deleted his Facebook account after January 6 and urged an individual whom he has messaged to delete their conversation.

At sentencing in Mr. Woods' case, Judge Mehta imposed no prison time.

### United States v. Matthew Baggott and Stewart Parks, 21-411 (APM)

Mr. Baggott was underneath the scaffolding on the Northwest stairs at 2:00 p.m. on January 6.  There, he tried to create an opening in the white sheeting to allow other rioters through and even threw an object at the USCP officers at the top of the Northwest stairs.  Baggott then joined the crowd charging up the Northwest stairs and went directly to the Senate Wing doors.  He was with Mr. Connell and Mr. Adams as they watched rioters open the Senate Wing doors, and he entered the Capitol within seconds behind Mr. Connell. Again, though, *unlike Mr. Connell*, Mr. Baggott remained



**Mr. Baggott (circled) just behind Mr. Connell (wearing grey baseball hat)**

inside the Capitol for more than 40 minutes, during which time he joined a crowd that had chased USCP Officer Eugene Goodman to the second floor, traveled far and wide throughout the building, and grabbed at a police officer's baton as he was being

expelled from the building.   Mr. Baggott was charged with misdemeanors and permitted to plead to one count of entering or remaining in a restricted building.   He was sentenced to 3 months incarceration.

Mr. Parks, charged with Mr. Baggott, was also inside the scaffolding on the Northwest staircase.   He charged up the steps and went directly to the Senate West Wing Door. Again, he watched from feet away as rioters smashed open windows, crawled through those windows, and kicked open the door from the inside. He entered the Capitol 12 seconds after the Senate Wing doors were opened.   He remained in the Capitol for over 45 minutes and stole a metal detector wand on his way out. The government only proceeded with misdemeanor charges against Mr. Parks. Instead of accepting responsibility as Mr. Connell has, Mr. Parks proceeded to trial, at which he testified falsely, including claiming that he saw no indication that he was not permitted to go into the Capitol building.   The government sought a sentence of 15 months and Judge Mehta sentenced Mr. Parks to 8 months incarceration.

### United States v. Neil Ashcraft, 22-CR-295 (CKK)

Mr. Ashcraft *climbed* the same scaffolding that Mr. Connell walked through. He used a knife to cut a hole in the white sheeting covering the scaffolding to allow other rioters through.   He encouraged other rioters to come forward.   He then scaled the same Northwest stairs Mr. Connell did and entered the Capitol building less than one minute after Mr. Connell through the same door.   In fact, the government's sentencing memorandum described his entry through the Senate Wing Door this way:

> At approximately 2:13 p.m., rioters broke windows next to the Senate Wing Door, entered the U.S. Capitol building, and broke open the Senate

Wing Door from inside the building. Ashcraft was right there, watching it happen. He saw rioters banging on the doors. He saw rioters use pieces of wood to smash in the windows. He knew the rioters were breaking into the building illegally.

ECF No. 20, p. 6.

Mr. Ashcraft then remained inside the Capitol for 41 minutes, moving throughout the building.  When he finally left the building, he took with him a stolen flag and flagpole.  He then spent 30 minutes speaking with a member of the Oath Keepers about steps he needed to take to join that extremist group.  Despite the fact that he was part of the same crowd that went up the Northwest stairs as Mr. Connell, entered the Capitol just after Mr. Connell, and then stayed in the building far longer than Mr. Connell and stole property from within, Mr. Ashcraft was charged with and pled to Theft of Government Property and Entering and Remaining in a Restricted Building.   The government sought a sentence of just 90 days incarceration and Judge Kollar-Kotelly sentenced Mr. Ashcraft to 80 days incarceration.

*United States v. Aaron Mostofsky, 21-CR-138 (JEB)*

 Mr. Mostofsky spent an hour on the West Plaza, during which he pushed against a barrier that officers were using to hold rioters back. He then climbed the Northwest Stairs with the crowd that had pushed past officers. He stole a U.S. Capitol Police bullet-proof vest and went to the Senate Wing door, where he watched rioters breaking open the Senate Wing door from the inside. Mostofsky entered just after Mr. Connell.  Already wearing a stolen police vest, Mostofsky then picked up a police riot shield and carried it with him as he moved up the stairs with the crowd that chased Officer Goodman. He remained inside the Capitol for 20 minutes. In a chat

communication on January 10, Mostofsky said that his "brother is connected to conservative party and my father's a Judge; so, unlike other situations. . . [t]hey have nothing on me."

Although he was originally charged with Obstruction of an Official Proceeding and other charges, Mr. Mostofsky was permitted to plead guilty to Civil Disorder, Theft of Government Property, and Entering or Remaining.  The government sought a sentence of 15 months and Judge Boasberg sentenced Mr. Mostofsky to 8 months incarceration.

## CONCLUSION

In its opening sentencing memorandum, the defense described Mr. Connell's unique family circumstances. He is a working single father who is extremely concerned about the well-being of his young daughter. But even setting those circumstances aside, the above comparator cases make even more clear that the Court should not impose a lengthy sentence. Mr. Connell should be sentenced based upon his conduct, not based upon the government's decision to seek convictions and guidelines calculations far harsher than those sought in comparable cases.

Respectfully submitted,

/s/

_____

NED SMOCK
Assistant Federal Public Defender